Filed 7/6/23  P. v. Kane CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B319263 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA062376) |
| v. | |
| MICHAEL KANE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joseph A. Brandolino, Judge.  Affirmed.

Sally Patrone, under the appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Charles S. Lee and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and appellant Michael Kane was convicted of murder and two counts of extortion, along with his codefendant Matthew Herrera.[1]  His conviction was affirmed on direct appeal. Over 10 years later, defendant filed a petition for resentencing under Penal Code section 1172.6.[2]  After an evidentiary hearing, the trial court denied defendant's petition for relief, on the grounds that he acted with the intent to kill.  Defendant appeals, arguing (1) the trial court improperly relied on the appellate opinion in his direct appeal; (2) the prosecutor committed misconduct in arguing the evidence; and (3) there is insufficient evidence of intent to kill.  We reject these contentions and affirm.

### *FACTUAL AND PROCEDURAL BACKGROUND*

### *1.    The Crimes*

Because we are concerned only with evidence of intent to kill, we limit our discussion of related events.  The story begins with a marijuana sale interrupted by police, and ends with defendant and Herrera killing the man they believed responsible for the arrest of their friend.

### **A.    The Marijuana Sale and Arrests**

Jamie Rainer rented a room in a house in which any number of other people also rented rooms; the house was located

---

[1]    Two additional codefendants, Paul Merino and Juan Hernandez, were also tried with defendant and Herrera, but charged only with the extortions.

[2]    The statute was originally number 1170.95; it was renumbered effective June 30, 2022.  (Stats. 2022, ch. 58, § 10.) We use the current numbering.  Unless otherwise indicated, all undesignated statutory references are to the Penal Code.

on Kelvin Avenue. Two of the other renters were Diane Vigil and Esteban Arraya. Jamie and Diane had known each other and defendant from their mutual prior residence, a sober living home.[3] They did not know Esteban before they moved to the Kelvin house.

On June 15, 2009, Esteban asked Jamie if she could help him obtain some marijuana. Jamie, in turn, called defendant, asking if he could assist. Defendant could, but he repeatedly asked if Esteban was a police informant. Eventually, defendant agreed, and told Jamie to come to his house. Jamie then asked Diane to drive them over to defendant's place. In the car were: Diane, Diane's children, Jamie, Jamie's dog, and Esteban.

At defendant's house, defendant told Diane to drive to a Jack-in-the-Box parking lot to do the deal with his associate. Defendant stayed behind with Diane's children, Jamie and Jamie's dog. Sandy Motta, a roommate of defendant's, got in the car to go to Jack-in-the-Box to get some food for her daughter. Thus, in the car at this point were: Diane, Sandy, and Esteban.

In the Jack-in-the-Box parking lot, the buyers met defendant's associate, Abraham Nunez, who sold them a small container of marijuana. Police had been watching the location and saw the transaction. Abraham was arrested for sale of marijuana; Diane and Esteban were arrested for possession. Sandy, who had gone into the restaurant before the transaction, was questioned and released. Later that night, Diane and Esteban were also released; Abraham was not.

---

[3]     We use first names of victims and witnesses to simplify the discussion; no disrespect is intended.

## B.    The Extortions

When Diane and Sandy did not immediately return, Jamie telephoned them.  Sandy picked up and reported that the others had been arrested.  Jamie told defendant.

Defendant telephoned codefendant Herrera, who came to defendant's house with others, including codefendants Marino and Hernandez.  Defendant asked Jamie to come into his bedroom, where everyone was gathered.

Codefendant Herrera took the lead.  He questioned Jamie to see if she was an informant.  He made her take off her clothes to prove she was not wearing a wire; she complied.  He repeatedly asked how she knew Esteban and whether he was a rat. Codefendants Herrera and Merino continued to ask her if Esteban was an informant; she kept saying he was not. Codefendant Herrera said that if she did not give him the answers he wanted, they would find where she lived and "CPA" would be after her; she believed that to be a gang.  Codefendant Merino repeated the questioning about Esteban; when Jamie proclaimed his innocence, codefendant Merino said he did not believe her.  He asked defendant if he had a shovel; defendant agreed and brought him one.  Codefendant Merino told Jaime that if she did not give him the answers he wanted to hear, he would kill her and she would have to dig her own grave. Codefendant Herrera told Jamie that she needed to help with bail money to get their friend out of jail.

At this point, Sandy returned and came into the room. When Sandy attempted to return Jamie's cell phone to her, codefendant Merino grabbed it and threw it against the wall. Codefendant Herrera told Sandy that she, too, needed to come up

4

with bail money for Abraham. After Herrera slapped Sandy in the face, she agreed to try to get $75.

Codefendant Herrera struck Jamie twice, and kicked her in the head. He took her dog from her lap and threw the dog against the wall. He threatened to kill Jamie. Codefendant Hernandez also hit Jamie. At some point, she offered $200; she did not have the money, but feared for her life.

Once Diane was released by police, she returned to defendant's house (where her daughters were) and defendant asked her to go into the bedroom. She witnessed codefendant Herrera holding Jamie responsible for bringing Esteban to them, and demanding Jamie and Sandy come up with bail money for Abraham.

Diane then took Sandy and Jamie to various meeting places to obtain the money they had promised defendant and his codefendants. Ultimately, on Sandy and Jaime's behalf, Diane delivered $185 and a stereo (which they had obtained from Esteban). Codefendant Herrera told Diane and Sandy over the telephone that this was acceptable and they had done their part.

### C.    The Murder

Defendant and codefendant Herrera were not, however, done with Esteban.

In the early morning hours of June 18, 2009, they went together to the Kelvin house. Codefendant Herrera had a gun.

Angelina Frias, her husband Kiefer Ollivierre, and their children lived in a room in the converted garage next to the main house on Kelvin. That morning, the entire family was in the kitchen of the main house readying breakfast. Antonio (Tony) Araiza also had a room in the Kelvin house. When Angelina saw the two men outside the house, she knocked on Tony's door and

5

told him about them.  Then one of the two men knocked on the door to the house.  Tony opened it.

Codefendant Herrera looked at Kiefer and asked, questioningly, "Esteban?"  Kiefer said he was not.  One or both of the men then turned to Tony and asked him, in Spanish, if they could go outside and talk to him for a minute.  Tony nodded and walked out with them, closing the door behind him.

Defendant and codefendant Herrera surrounded Tony and walked him over to the converted garage – codefendant Herrera was in front, Tony in the middle, defendant behind him.  About "a minute later," inside the converted garage, someone shot Tony in the chest.

Defendant and Herrera fled.  Defendant had Angelina's computer, which she had left charging on her bed.

Norine Reed lived in a little room off the garage at the Kelvin house.  After the gunshot, she saw defendant and Herrera running away.  She testified one of them had a gun in his hand.  Critically, she identified Herrera at trial as one of the men she saw running, but she testified that he was *not* the man with the gun.  She explained that the man with the gun was the shorter of the two assailants.  Defendant is 5-foot-9; codefendant Herrera is 6-foot-2.  In other words, although Norine did not identify defendant at trial, she did, effectively, testify that a gun was in his hand when he fled the scene.[4]  Norine ran into the other room

---

[4]     We go into detail about Norine's testimony because much of defendant's opening brief in this appeal is based on the premise that there was no evidence that defendant had the gun.  (E.g., "No witness saw appellant with a gun, . . ."; "There is no evidence to suggest appellant took the gun from Herrera.")  But Norine

6

in the garage and saw Tony on the floor, barely breathing. He subsequently died from the gunshot wound.

## 2. *Initial Trial and Appeal*

Defendant was charged by information with two counts of extortion (Jamie and Sandy) and one count of murder (Tony, mistaken for Esteban). He was alleged to have suffered one prior conviction, which qualified as a prior prison term, prior serious felony, and prior strike within the meaning of the three strikes law. (§ 667.5, subd. (b); 667, subd. (a)(1); 667, subds. (b)-(i).) As to the murder, it was alleged that codefendant Herrera personally used a firearm causing death. (§ 12022.53, subd. (d).)

Defendant was convicted of both counts of extortion and first-degree murder. The trial court found the prior conviction true. Defendant was sentenced to prison for 65 years to life, calculated as the high term of 4 years, doubled for the strike, for one count of extortion; plus 1 year (1/3 the middle term), also doubled, for the other; consecutive to 25-life, doubled, for the murder; plus five years for the prior serious felony.

---

saw the shorter man – the man who was not codefendant Herrera – with the gun. At this stage of the case, identity is not at issue; defendant was the second attacker that morning. Despite defendant's representations to the contrary, Norine's testimony put the gun in defendant's hand after the shooting. After the Attorney General pointed out Norine's testimony to this effect in its respondent's brief, defense counsel, in her reply brief, made no effort to address this evidence, but simply stated, again, that defendant "was identified by witnesses as the person without the gun." While it is true that Angelina saw codefendant Herrera with a gun before the shooting, Norine saw defendant with a gun after it.

7

Codefendant Herrera was also convicted of first-degree murder. The jury found the firearm enhancement not true.

Defendant, along with two of his codefendants, appealed their convictions. In 2011, a different panel of this appellate division affirmed, with minor irrelevant sentence modifications. (*People v. Hernandez* (Nov. 4, 2011, B224527) [nonpub. opn.].) Specifically, the court rejected defendant's contentions that there was insufficient evidence that: (1) he possessed the intent to kill; (2) he premeditated and deliberated the murder; and (3) he committed a burglary or robbery justifying conviction for felony-murder.[5]

### 3. *Section 1172.6 Motion and First Appeal*

"Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015; Senate Bill 1437) eliminated natural and probable consequences liability for murder as it applies to aiding and abetting, and limited the scope of the felony-murder rule. (Pen. Code, §§ 188, subd. (a)(3), 189, subd. (e), as amended by . . . Senate Bill 1437.)" (*People v. Lewis* (2021) 11 Cal.5th 952, 957.) Specifically, under the new law, an aider and abettor cannot be convicted of felony murder unless the defendant acted with the intent to kill or was a major participant who acted with reckless indifference to human life. Senate Bill 1437 also added section 1172.6 to the Penal Code, which creates a procedure for convicted murderers who could not be found guilty under the law as amended to retroactively seek relief.

---

[5] Our appellate record does not include the jury instructions at defendant's trial. It is apparent, however, that the prosecution proceeded on two theories of first-degree murder: premeditated and felony-murder.

On May 23, 2019, defendant, representing himself, filed a petition for resentencing under section 1172.6. At defendant's request, the trial court appointed counsel. The prosecution opposed the petition, arguing that defendant was ineligible for relief on the basis that the Court of Appeal, in affirming defendant's conviction, found sufficient evidence of intent to kill. The trial court agreed and denied the motion. On defendant's appeal, the prosecution conceded reversal was required. A different panel of this appellate division reversed, stating, "There is nothing in the record that indicates which theory the jury espoused [direct liability or felony murder], or whether some jurors relied on one theory while other jurors relied on the other. Thus we cannot say, and the appellate court did not hold, that [defendant] possessed the intent to kill as a matter of law. Substantial evidence supports both theories, but at this point in the proceedings pursuant to section [1172.6] the trial court may not engage in fact-finding, and [defendant] is entitled to the benefit of the doubt." (*People v. Kane* (Jan. 19, 2021, B304451) [nonpub. opn.], p. 10.)

### 4. *Hearing and Denial*

Upon receipt of the remittitur, the trial court found defendant established a prima facie case for relief and set the matter for a hearing. The prosecution recognized the trial court was required to evaluate the "facts presented at trial" and determine whether defendant was entitled to relief. The prosecution argued that he was not, on the basis that the evidence at trial demonstrated defendant was a direct aider and abettor of the murder who acted with intent to kill. The prosecution specifically argued that the court could rely on the

9

entirety of the record of conviction, including the appellate opinion affirming defendant's conviction.

Defendant argued that counsel "will rely on the transcripts from [defendant's] trial, as well as the entire record of conviction, in presenting the argument" for resentencing.

At the March 21, 2022, hearing, no witnesses were called. After argument, the court made "an independent decision to deny the defendant's petition for resentencing and adopt[ed] the appellate court's decision," particularly as related to defendant's intent to kill, as its own.

Defendant filed a timely notice of appeal.

## DISCUSSION

On appeal, defendant argues error in three respects: (1) the trial court improperly relied on the prior Court of Appeal opinion rather than its independent review of the evidence; (2) the prosecutor committed misconduct in argument; and (3) there is insufficient evidence of intent to kill.

### 1.     *The Trial Court Did Not Rely on the Appellate Opinion*

Initially, subdivision (d)(3) of section 1172.6 did not specifically identify the evidence that could be used at the hearing to determine entitlement to relief, and it was thought that the record of conviction, including any prior appellate opinion, could be used.  (See *People v. Clements* (2022) 75 Cal.App.5th 276, 283 (*Clements*).)  Senate Bill No. 775 (2021-2022 Reg. Sess.), effective January 1, 2022, amended the statute to set forth limitations on the evidence, providing, "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is

admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. *The court may also consider the procedural history of the case recited in any prior appellate opinion.*" (Stats. 2021, ch. 551 (S.B. 775), italics added.) This "specificity indicates the Legislature has decided trial judges should not rely on the factual summaries contained in prior appellate decisions when a section [1172.6] petition reaches the stage of a full-fledged evidentiary hearing." (*Clements, supra,* 75 Cal.App.5th at p. 292.)

We agree that, under the law as the Legislature has amended it, the trial court may not rely on the facts as set forth in the prior appellate opinion. Instead, the court is required to rely on the trial (and any other admissible) testimony.

Here, however, the trial court did not *rely* on the facts set forth in the prior opinion. The court took great pains to explain that, while it *agreed* with the facts and the analysis in the appellate opinion, it made its determination independently: "And I do think that the evidence does support [the finding of intent to kill] beyond a reasonable doubt, and I want to make clear that I make this finding as a fact finder for this hearing. [¶] I'm relying on the record of conviction. I was the judge during the trial and heard the evidence. So it's an independent finding by this court based on the evidence that was presented at trial, although I will also note that the appellate court found the evidence sufficient on the intent-to-kill-aiding-and-abetting theory as well as they found evidence supported premeditation and deliberation. I think they got it right, and I adopt their findings and the facts recited by the appellate court as well. But I made clear that this is an independent decision by this court. But I think they got it right."

11

On appeal, defense counsel suggests that "the court was doing what it said it was not doing." There is no evidence that this is so; the court's evaluation was, as it expressly stated, independent of the appellate opinion.

## 2. *There Was No Prosecutorial Misconduct*

At the section 1172.6 hearing, the prosecutor argued, "There was evidence that – at least one gun was at the location being seen in Mr. Herrera's possession at one point and immediately after the shooting by the Defendant, Mr. Kane." Defendant assigns this as misconduct, claiming, "it was misconduct for the prosecutor to argue at the evidentiary hearing that appellant was armed because it was not supported by the charging documents or the evidence presented at trial."[6] First, we observe that defendant has forfeited the argument as misconduct was not assigned at trial.[7] Regardless, as we have

---

[6] Defendant's suggestion that the prosecutor's argument is inconsistent with the charging documents is based on the fact that the operative information alleged a personal use firearm enhancement against codefendant Herrera, which the jury ultimately found not true. At the entitlement hearing, the prosecutor argued that defendant's possession of the gun after the shooting supported the conclusion that he was a direct aider and abettor; the prosecutor did not argue that defendant shot Tony.

[7] At the hearing, not only did defendant's counsel fail to object to the alleged misconduct, she said she "would embrace every single one of the facts" that the prosecutor mentioned. She specifically stated, "There was evidence that Mr. Kane had the gun [when the two men ran away] and that he decided to tuck it in his back. That was after the fact."

12

discussed, defendant is mistaken on the facts.  Norine testified that she saw him with the gun immediately after the shooting; the prosecutor's argument was a well-supported comment on the evidence.

**3.    *There is Sufficient Evidence of Defendant's Intent to Kill***

Section 1172.6, subdivision (d)(3), as amended by Senate Bill 775, provides, "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended . . . ."  We review the trial court's findings for substantial evidence, viewing the evidence in the light most favorable to the prosecution and presuming in favor of the judgment every fact the trial court reasonably could have deduced from the evidence.  We resolve neither credibility issues nor evidentiary conflicts.  (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.)

The trial court found beyond a reasonable doubt that defendant had the intent to kill; we have reviewed the trial transcripts and conclude, just as our prior panel did in 2011, that substantial evidence supports this conclusion.  Specifically, the evidence demonstrates the following:  defendant and his

---

On appeal, appellant argues that an objection would have been futile at the section 1172.6 hearing because the prosecutor pointed out that he, the prosecutor, had been the district attorney at trial.  The suggestion that the trial court would defer to the prosecutor's recollection and not make its own independent finding runs contrary to the trial court's statement and is an inappropriate disparagement of the trial court.

codefendant Herrera believed Esteban was responsible for the arrest of their colleague, Abraham. They had originally speculated Jamie was an informant, and their codefendant Merino had threatened to kill Jamie if she did not give them the right answers to their questioning. Far from disagreeing with codefendant Merino, defendant obtained the shovel with which Jamie would be forced to dig her own grave should she prove disloyal. A few days later, defendant and codefendant Herrera went to the Kelvin house, where Esteban lived. Codefendant Herrera had a gun. They knocked on the door and asked for Esteban. They saw a Hispanic man believed to be Esteban and asked him outside. They then walked him away from the people in the house – to an apparently deserted garage – and one of them shot the victim in the chest about a minute later. Nothing suggests that the victim even had the time to explain that he was not Esteban. The two men fled, taking a computer with them. Defendant was seen with a gun in his hand as they ran, leading to the conclusion that either both men were armed, or both men were working together to such a degree that they shared possession of the gun. Neither stayed to assist the dying man as he struggled to breathe. Taken together, these facts add up to an execution: defendant and Herrera believed Esteban to have ratted out their friend, and they went to his house to kill him.

Defendant argues that the evidence does not demonstrate an intent to kill, but only an intent to commit an additional extortion, in order to obtain more cash or assets to pay Abraham's bail. But there was a difference between the extortion victims and Esteban: defendant knew Jamie and Sandy, and believed they had sufficiently proven their innocence; defendant did not know Esteban, and thought he was an informant. More

14

than that, defendant approached the man he believed to be Esteban far differently from how he approached his extortion victims. With Jamie and Sandy, he obtained the help of his three codefendants and other individuals as well, surrounding them and frightening them with threats, while giving them time to explain themselves and agree to pay. With Esteban, defendant and Herrera alone approached the house, one or both of them armed, took their victim to an apparently secluded location, and almost immediately shot him.

That defendant extorted other victims does not mean he did not intend to kill the man he thought was Esteban; substantial evidence supports the conclusion that he did, in fact, intend to kill.

### *DISPOSITION*

The order denying defendant's section 1172.6 petition is affirmed.

RUBIN, P. J.

WE CONCUR:

MOOR, J.

KIM, J.

15